NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHARON SCIPIO, | : | CIVIL ACTION NO. 12-7722 (MLC) |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| v. | : | |
| PHILADELPHIA CONTRIBUTORSHIP INSURANCE CO., *et al.*, | : | |
| Defendants. | : | |

**COOPER, District Judge**

This is an insurance dispute arising out of property damage caused by a vehicle crashing into the home of plaintiff Sharon Scipio and her family. Ms. Scipio was the holder of a homeowner's property and casualty insurance policy with defendants Philadelphia Contributorship Insurance Company and Germantown Insurance Company. Ms. Scipio brought this case seeking damages under that insurance policy, as well as other relief, from her insurers and two adjusters she had hired to assist her with her insurance claim. (Dkt. 29.)[1] The defendant insurance companies now jointly move for summary judgment, claiming that they have satisfied their obligations under the insurance policy and alternatively that Ms. Scipio should be barred from collecting additional funds because she failed to comply with her obligations under the insurance policy. (Dkt. 41.) After reviewing the briefing and

---

[1] The Court will cite to documents filed on the Electronic Case Filing System ("ECF") by referring to the docket entry numbers as "dkt." Pincites reference ECF pagination.

documents submitted by the parties, we conclude that there are genuine disputes of material fact remaining in this case and will deny the defendants' motion for summary judgment. The Court resolves this motion without oral argument. See L.Civ.R. 78.1(b).

**I.     Factual Background**

Plaintiff Sharon Scipio is the holder of an insurance policy (the "Policy") with Germantown Insurance Company, a subsidiary of Philadelphia Contributorship Insurance Company ("PCIC") (collectively "Insurance Defendants.") (Dkt. 41 at 1; dkt. 41-2.) The Policy covers a house located at 339 West Hanover Street in Trenton, New Jersey (the "Property"), and was in effect on November 30, 2011. (Dkt. 41-2; 41-3.) The Policy provided coverage for damage to the dwelling of up to $339,000 and additional coverage for Additional Living Expenses ("ALE") of up to $101,700. (Id.)

The Policy covered various types of damage to the home, including certain types of mold damage:

> . . . we do insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within: (a) A plumbing, heating, air conditioning or automatic fire protective sprinkler system, or a household appliance, on the "residence premises"; or (b) A storm drain, or water, steam or sewer pipes, off the "residence premises".

(Dkt. 41-3 at 25.)

The Policy also imposes a number of duties on the insured, providing that:

> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us . . . :
> (1) Give prompt notice to us or our agent;
> […]

> (4) Protect the property from further damage. If repairs to the property are required, you must: (a) make reasonable and necessary repairs to protect the property; and (b) keep an accurate record of repair expenses;
> (5) Cooperate with us in the investigation of a claim;
> (6) Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss;
> (7) As often as we reasonably require: (a) show the damaged property; and (b) provide us with records and documents we request and permit us to make copies;
> (8) Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth to the best of your knowledge and belief: (a) the time and cause of loss; (b) the interests of all insureds and all others in the property and all liens on the property; (c) other insurance which may cover the loss; (d) changes in title or occupancy of the property during the term of the policy; (e) specifications of damage to buildings and detailed repair estimates; (f) the inventory of damaged personal property described in 6 above; (g) receipts for additional living expenses incurred and records that support the fair value rental loss.

(Id. at 29.)

The Policy also contains a mechanism for resolving disputes over the amount of loss:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

(Id. at 30.)

This case arises out of property damage caused by a stolen vehicle crashing into the Property on November 30, 2011. The Property suffered substantial damage from the crash. (Dkt. 51-1 at 2.) Within days of the crash, the City of Trenton's Department of Inspections declared the Property unsafe, turned off the gas and electricity, and ordered the Property to remain vacant until necessary repairs were made. (Dkt. 41-6.) Ms. Scipio filed an insurance

3

claim for damages shortly thereafter. (Dkt. 51-1 at 2.) Ms. Scipio retained Action Adjustment Service, Inc. ("Action Adjustment") to advise and assist her in the adjustment process. (Dkt. 41-4.) Action would later estimate the necessary repair costs at $52,347.22. (Dkt. 51-7 at 8.)[2]

In December 2011, the Insurance Defendants retained Puro-Tech, Ltd. ("Puro-Tech") to provide an estimate of the cost to repair the Property. (Dkt. 41 at 2; dkt. 41-5.) Puro-Tech subsequently issued a report (the "Puro-Tech Report") identifying various necessary repairs for an estimated cost of around $20,000. (Dkt. 41-5.) Specifically, the Puro-Tech Report identified $23,390.35 as the replacement cost value; $20,575.23 as the actual cash value; $19,575.23 as the net claim value; and $22,390.395 as the net claim including recoverable depreciation. (Dkt. 41-5 at 12.) The Insurance Defendants issued a check for $19,575.23 (the "net claim" amount in the Puro-Tech Report) to Ms. Scipio on December 29, 2011. (Dkt. 41 at 3.)

Also in December 2011, the Insurance Defendants retained David Daniels, a structural engineer with Paul Zamrowski and Associates, Inc. Mr. Daniels issued a report (the "Daniels Report") identifying damage to the Property and recommending repairs. (Dkt. 41-7.) The Daniels Report concluded that the damage caused by the car crash was limited to the front masonry landing and steps and a portion of a

---

[2] Ms. Scipio ultimately ended her relationship with Action Adjustment over various disagreements and Action Adjustment has been named as a defendant in this action. Ms. Scipio's claim against Action Adjustment is not at issue in this summary judgment motion. (Dkt. 51-8; dkt. 51-9.) Ms. Scipio subsequently hired Citizen Public Adjusters, Inc. ("Citizen"), who was also subsequently named as a defendant in this action. (Dkt. 51-9 at 6.)

foundation wall, along with additional cosmetic damage. (Id. at 6.) The Daniels Report did not attempt to quantify repair costs.

In March 2012, Ms. Scipio sought and received an estimate from Trevor Carpentry for the cost of additional repairs beyond those identified in the Puro-Tech Report. Trevor Carpentry estimated the cost of additional repairs to be $9,516.29 bringing the total estimated cost of repairs (combined with the replacement value of $23,390.35 from the Puro-Tech Report) to $32,906.64. (Dkt. 41-11 at 2–3.)

In April 2012, another entity, Flex Builders ("Flex") submitted an estimate of the costs needed to repair the Property (the "Flex Report"). (Dkt. 41-10.) The Insurance Defendants contend that all parties agreed to have Flex provide a new estimate of repair costs after discussing the issue with Citizen, who had been hired by Ms. Scipio to assist her with her claim. (Dkt. 41 at 4.) Ms. Scipio disputes the assertion that she agreed to hire Flex and claims that, in any event, Flex was not hired pursuant to the Policy provisions governing appraisal disputes. (Dkt. 49 at 22.) The Flex Report's estimate of damages was somewhat higher than the estimate in the Puro-Tech Report. Specifically, the Flex Report identified $38,391.22 as the replacement cost value; $34,191.77 as the actual cash value; $33,191.77 as the net claim; and $37,391.22 as the net claim including recoverable depreciation. (Dkt. 41-10 at 11.) The Insurance Defendants contend that they have paid Ms. Scipio a total of $33,191.77 for repairs, in line with the net claim value set out in the Flex report. (Dkt. 41 at 5.)

Ms. Scipio, again unsatisfied with the repair estimates, hired her own evaluators to assess repair costs. Luis Perez of LRP Engineering, Inc. submitted an evaluation (the "LRP

5

Report") on August 14, 2012.  (Dkt. 51-12 at 2–6.)  The LRP Report stated that certain repairs were undertaken but that additional repairs were needed.  (Id. at 2.)  Among other issues, the LRP Report noted issues with the walls of the home and concluded that the crash had caused "extensive damage to the structure and further repairs are needed."  (Id. at 6.)  The LRP Report estimated the cost of repair at $50,500 together with additional unspecified sums to account for mold damage to the Property.  (Id.)  Ms. Scipio also engaged a mold expert, Gigantic, who estimated the cost of mold cleanup at $9,913.83.  (Dkt. 51-11 at 4.)

Ms. Scipio also hired Enterprise Home Remodeling ("Enterprise") and Trevor Carpentry to evaluate the necessary repairs.  (Id.)  Enterprise issued a proposal on January 28, 2013 to perform various repairs to the Property for $17,500.  (Dkt. 41-8.)  It appears that Enterprise's proposed repairs were to be undertaken by contractor Antuan Frayman.  (Dkt. 41 at 3.)

On January 13, 2015, Walter Green of Fleischer Forensics, having been engaged by Ms. Scipio, evaluated the damage to the Property.  (Dkt. 51-6.)  Mr. Green's report (the "Green Report") contained comments on the earlier-issued Daniels Report and LRP Report. (Dkt. 51-6 at 4–5.)  Specifically, the Green Report stated—in contrast to the Daniels Report— that additional evaluation was needed to determine whether the Property had suffered structural damage.  (Id. at 4.)  Mr. Green ultimately concluded that "the damage resulting from the impact of the vehicle . . . has not been fully evaluated and/or repaired" and that "[a]dditional work is necessary to fully evaluate the potential hidden damage to the wood structure of the front wall of the residence . . . ."  (Id. at 5.)  Mr. Green performed a second evaluation in April 2015 in which he concluded that a side foundation wall in the home had

6

been damaged from the car crash, and that the damage could be repaired while the home was occupied by the use of adequate "temporary bracing." (Id. at 20–21.) The Insurance Defendants contend that the Green Report "identifies no structural damage, or any new items of repair that have not been previously identified." (Dkt. 41 at 8.)

Ms. Scipio also hired Lubomir Cizmar, a contractor, to assess the damage to the Property. Mr. Cizmar submitted an affidavit with additional estimates of repair costs totaling more than $40,000. (Dkt. 51-13 at 12–15.)

Ms. Scipio also collected Additional Living Expenses ("ALE") reimbursement from the Insurance Defendants. An email between PCIC and Citizen (hired by Ms. Scipio to assist her with her claim) explains that PCIC did not provide ALE damages from February to May 2012 based on Ms. Scipio's alleged failure to cooperate and begin needed repairs. (Dkt. 41-12.)

The Insurance Defendants claim they have disbursed a total of $38,990.25 in ALE to Ms. Scipio. (Dkt. 41 at 6.) They also claim they have disbursed a total of $67,382.02 in ALE and structural repair costs. (Id.) Although those totals suggest that the Insurance Defendants have paid Ms. Scipio $28,391.77 for repair costs, they state elsewhere that they have paid Ms. Scipio a total of $33,191.77 for repairs. (Id. at 5.)

## II.     Parties' Arguments

The Insurance Defendants contend that summary judgment should be granted in their favor for three reasons. First, they argue that they have already paid Ms. Scipio for the damages sustained to the property and that any further payment would be a prohibited "double recovery" under the Policy. (Dkt. 41 at 19–21.) They stress that the $33,191.77 they

7

have already disbursed to Ms. Scipio for repair costs covers all of the repairs that needed to be done, including those identified by Ms. Scipio's experts. (Id. at 21.) Second, they argue that Ms. Scipio did not meet her obligations under the "cooperation clause" of the Policy and therefore should be denied additional funds. (Id. at 21–22.) Finally, they argue that "equitable considerations" warrant dismissal of Ms. Scipio's claims. (Id. at 22–23.) Specifically, they contend that Ms. Scipio has "unclean hands," and that her refusal to arrange for the necessary repairs should bar further recovery under the Policy.[3] (Id.)

      Ms. Scipio responds with a number of counter-arguments. First, she alleges that there are significant factual disputes over the extent of damage and associated repair costs. (Dkt. 49-1 at 8–12.) In particular, she highlights various estimates (*i.e.*, the Green Report, the LRP Report, and Trevor Carpentry estimate) that she claims are at odds with the estimates provided by the Insurance Defendants' contractors. (Id.)[4] She also contends that there are unresolved questions about whether the Policy should cover mold damages (id. at 14–15) and whether she is entitled to additional ALE damages (id. at 16–17). Second, Ms. Scipio argues that she did in fact cooperate with the Insurance Defendants. (Id. at 12–13.) She attributes delays in the process to the actions of the claim adjusters she had hired to help her navigate

---

[3] Paul Yemm of Action Adjusters, formerly engaged by Ms. Scipio, testified at his deposition that Ms. Scipio had delayed the repairs out of her desire to use her preferred contractor who was not licensed to perform the work in New Jersey. (Dkt. 41-14 at 5–8, 11.) Mr. Yemm also testified that he had a "difference of opinion" on several items with Ms. Scipio, such as whether the roof needed repairs. (Id. at 7.) He believed the repairs needed at the Property could have been completed in a month or less. (Id. at 18–19.)

[4] The Insurance Defendants submit that we should ignore the Green Report because Mr. Green did not do enough to investigate the Property and, consequently, it contains "unsupported theories that he chose not to prove or disprove." (Dkt. 53 at 4.) This argument apparently raises an admissibility argument under Federal Rule of Evidence 702, which will not address in this motion.

the adjustment process. (Id.)  Finally, Ms. Scipio contends that she acted in good faith throughout this dispute and that any "unclean hands" defense raised by the Insurance Defendants should be decided at trial rather than at summary judgment. (Id. at 13–14.)  In support, she cites her own affidavit and the various professionals she has engaged in connection with this dispute. (Id.)

### III.   Legal Standards

Rule 56 provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The non-movant must then present evidence that raises a genuine dispute of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."  Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (internal citation and quotation omitted).  This evidence may include "citing to particular parts of materials in the record" or a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c).

### IV.   Application

We conclude that there are genuine disputes of material fact that preclude us from granting summary judgment in favor of the Insurance Defendants.  Regarding the Insurance Defendants' argument that they have already reimbursed Ms. Scipio for her losses under the Policy, we find that there are outstanding questions of material fact as to whether Ms. Scipio

is entitled to additional funds. The accuracy and reliability of the various repair estimates is a question of fact rather than a question of law to be decided at summary judgment. Ms. Scipio has submitted estimates from several contractors—including Trevor Carpentry, Gigantic, the LRP Report, and the Green Report—that at least raise the question of whether Ms. Scipio is entitled to collect additional funds under the Policy.[5] On the question of mold damage, there appears to be no dispute that the Policy covers mold damage under certain circumstances (specifically, loss caused by mold "hidden within the walls, ceilings, or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within." (Dkt. 53 at 3.) The question of whether the mold found at the Property satisfies this definition is clearly a question of material fact rather than a question of law to be resolved at summary judgment.

In the same vein, we find that there are open disputes of material fact as to whether Ms. Scipio is entitled to additional ALE funds. The Insurance Defendants maintain that Ms. Scipio may not collect additional ALE funds because "there are no expert reports . . . that would support a position that Defendants acted unreasonably in ceasing ALE payments to Plaintiff because repair work . . . to this day, have still not yet been completed. . . ." (Dkt. 53 at 2.) It is not obvious, however, why a claim for additional ALE funds would require expert

---

[5] We may have reached a different conclusion if the Insurance Defendants had demonstrated unambiguously that they had complied with the Policy provision governing disputes over damage appraisals. But here, where there is an open factual dispute regarding whether any of the estimates (*e.g.*, the Flex Report) was a binding appraisal under the Policy, we cannot resolve now whether Ms. Scipio is barred from further reimbursement because of that provision.

10

reports or why alleged delays in performing repairs would necessarily have terminated ALE payments on a particular date.

The Insurance Defendants' second argument is that Ms. Scipio did not meet her obligations under the "cooperation clause" of the Policy and therefore should be denied additional funds.  As noted above, Ms. Scipio had contractual obligations under the Policy to cooperate with the Insurance Defendants in the adjustment and evaluation of her claim. Although we acknowledge that there is some evidence that Ms. Scipio may have taken some actions that delayed assessing and/or undertaking the necessary repairs to the Property, her sworn affidavit maintains that the delays were caused by the Insurance Defendants and the third party claims adjusters that have also been named as defendants in this suit. Consequently, there are also factual disputes here that cannot be resolved at summary judgment, particularly where, as here, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Anderson, 477 U.S. at 255.

For similar reasons, we decline to grant summary judgment on the grounds that Ms. Scipio acted with "unclean hands," as that defense turns on factual questions of whether Ms. Scipio unduly delayed assessing or repairing damage to the Property.  Although the Insurance Defendants note that some of Ms. Scipio's statements regarding delays on conducting the repairs may be "admissions" from which they can attempt to build an unclean hands defense (dkt. 53 at 3), the question of whether Ms. Scipio acted unreasonably under the circumstances remains a question for the finder of fact.

11

## CONCLUSION

For the reasons discussed above, we deny the Insurance Defendant's Motion for Summary Judgment (dkt. 41) with prejudice. The Court will issue an appropriate order.

 s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**Dated:**  March 16, 2017